Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL II

| | | |
|---|---|---|
| CLÍNICA YAGÜEZ, INC.<br><br>Parte Apelante<br><br>v.<br><br>MUNICIPIO DE GUÁNICA<br><br>Parte Apelada | TA2026AP00374 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Caso número: GU2023CV00085<br><br>Sala: 605<br><br>Sobre:<br>Cobro de Dinero – Ordinario y Otros |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, el Juez Rodríguez Flores y la Jueza Díaz Rivera.

Díaz Rivera, Jueza Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 28 de mayo de 2026.

Comparece ante *nos*, Clínica Yágüez, Inc. (parte demandante o apelante) y nos solicita que revisemos la *Sentencia* emitida el 13 de marzo de 2026 por el Tribunal de Primera Instancia (TPI o foro primario), Sala Superior de Ponce. Mediante el referido dictamen, el foro primario declaró *Ha Lugar* a la solicitud de sentencia sumaria presentada por el Municipio de Guánica (parte demandada o apelada) y, en consecuencia, desestimó la causa de acción de epígrafe.

Por los fundamentos que expondremos a continuación, confirmamos el dictamen apelado.

### I.

Surge del expediente ante nuestra consideración que, el 6 de julio de 2023, la parte demandante incoó una *Demanda* sobre sentencia declaratoria, incumplimiento de contrato y cobro de dinero contra la parte demandada.

Según las alegaciones, el 25 de enero de 2019, las partes suscribieron el Contrato Núm. 2019-000148, titulado "*Contrato de Servicios de Administración, Operación y Uso de las Facilidades del Centro de Diagnóstico y Tratamiento de Guánica*". En virtud de dicho contrato, la parte demandada cedió a la parte demandante la administración y operación del Centro de Diagnóstico y Tratamiento Juan M. Santiago de Guánica (CDT) por el término comprendido entre el 15 de febrero de 2019 y el 15 de febrero de 2023. En el referido contrato, la parte demandada reconoció recibir una subvención proveniente del Departamento de Salud destinada a cubrir parte de los costos de la operación del CDT, la cual totalizaba la suma de $499,999.00, y acordó ceder a la parte demandante el cien (100) por ciento de dicha subvención mientras estuviera vigente el acuerdo.[1]

La parte demandante alegó, además, que durante el referido período la parte demandada incurrió en varios incumplimientos contractuales, mayormente relacionados con asuntos de índole económica, lo que eventualmente obligó a la parte demandante a rescindir el contrato por lesión y devolver la posesión del CDT a la parte demandada el 31 de agosto de 2021. Aclaró que, aunque posteriormente la parte demandada completó el desembolso de las

---

[1] En específico, la cláusula décima del contrato estableció que:

"Mensualmente, **EL MUNICIPIO** recibe una subvención de parte del Departamento de Salud con el propósito de cubrir parte de los costos de la operación del Centro de Diagnóstico y Tratamiento Juan M. Santiago. Dicha subvención totaliza de **CUATROCIENTO NOVENTA Y NUEVE MIL NOVECIENTOS NOVENTA Y NUEVE DOLARES ($499,999)** anualmente. Las partes han acordado que EL MUNICIPIO le cederá el cien (100) por ciento [sic] de la subvención a **LA SEGUNDA PARTE**, mientras se encuentre en vigor el presente acuerdo. Ante la eventualidad de que **LA SEGUNDA PARTE** administre, opere y use el Centro de Diagnóstico y Tratamiento Juan M. Santiago durante una fracción de mes, la subvención deberá pagarse a prorrata. **EL MUNICIPIO** representa y garantiza que la subvención recibida del Departamento de Salud se puede ceder a la Segunda Parte sin ningún tipo de impedimento ya sea legal o de cualquier tipo. En caso de que **EL MUNICIPIO** deje de recibir dicha subvención, por cualquier motivo, las partes acuerdan renegociar de buena fe los términos del contrato dentro de un periodo de 60 días. De no llegar a un acuerdo favorable, **LA SEGUNDA PARTE** podrá, a su opción, dar por cancelado y terminado, de inmediato, este contrato, previa notificación escrita a **EL MUNICIPIO**."

cantidades adeudadas, se negó a desembolsar la partida objeto del presente pleito.

Expuso que, conforme a la Resolución Conjunta Número 62 de 6 de agosto de 2020 (Resolución Conjunta Núm. 62-2020), la Asamblea Legislativa ordenó a la Oficina de Gerencia y Presupuesto transferir la suma de $7,050,000.00 para la operación y los gastos de funcionamientos de las Salas de Emergencias de Centros de Diagnóstico y Tratamiento, lo cual redundó en que la parte demandada recibiera la suma de $430,000.00. Alegó que dicha medida perseguía asistir a los municipios que ostentaban la carga económica de operar dichas facilidades; sin embargo, sostuvo que fue la propia parte demandante quien asumió la totalidad de los costos asociados a la operación del CDT. A su juicio, ello provocó que la parte demandada fuese resarcida por gastos en los que nunca incurrió, frustrándose así la intención legislativa.

Añadió que el contrato suscrito entre las partes disponía de forma clara y libre de ambigüedad que las subvenciones gubernamentales recibidas por la parte demandada para la operación del CDT serían desembolsadas en su totalidad a la parte demandante para mitigar los costos asumidos. Así, concluyó que la asignación en controversia constituyó una asignación adicional a la subvención cedida mediante la cláusula décima del contrato.

Por tal razón, solicitó que se dictara sentencia declaratoria a los efectos de establecer que la Resolución Conjunta Núm. 62-2020 perseguía el propósito de subsidiar los costos asociados a mantener el CDT operando durante la crisis provocada por el COVID-19, costos que, según alegó, fueron sufragados por la parte demandante y no por la parte demandada. En consecuencia, sostuvo que tenía derecho al cien (100) por ciento de las subvenciones destinadas a la operación del CDT. Asimismo, concluyó que la parte demandada incumplió su obligación contractual al retener los $430,000.00

recibidos mediante la Resolución Conjunta Núm. 62-2020 y solicitó que se le ordenara el pago de dicha suma.

Oportunamente, el 6 de octubre de 2023, la parte demandada presentó su *Contestación a Demanda*. En esta, negó la mayoría de las alegaciones y admitió otras. No obstante, sostuvo que la parte demandante no rescindió del contrato por incumplimiento alguno, sino que se trató de una resolución voluntaria, debido a que la operación del CDT implicaba gastos que ya no podía sostener. Asimismo, negó que la parte demandante hubiese asumido todos los gastos del CDT, alegando que los gastos relacionados con la pandemia fueron facturados al ente municipal.

En cuanto al alegado incumplimiento, la parte demandada negó adeudar suma alguna a la parte demandante y argumentó que los fondos públicos objeto de controversia no podían utilizarse para mitigar pérdidas privadas. Replicó además que no existía un vínculo directo entre la subvención ordinaria del Departamento de Salud y los fondos adicionales asignados mediante las referidas resoluciones conjuntas. Aseveró, igualmente, que la cesión pactada en el contrato no contemplaba que toda ayuda o fondo adicional recibido por la parte demandada tuviera que ser cedido a la parte demandante. Por ello, alegó afirmativamente que la parte demandante no tenía derecho al remedio reclamado.

Luego de varias incidencias procesales, el 28 de octubre de 2025, la parte demandante presentó una *Solicitud de Sentencia Sumaria*. Alegó que la única controversia subsistente giraba en torno a la interpretación del contrato suscrito entre las partes, particularmente a la luz de las disposiciones de la Resolución Conjunta Núm. 24-2020 y Resolución Conjunta Núm. 62-2020, específicamente en cuanto al uso de los fondos asignados mediante dicha legislación. Sostuvo que constituía un hecho incontrovertido y sustentado por los documentos presentados que la parte

demandada recibió la suma de $430,000.00, durante el mes de octubre de 2020, mientras permanecía vigente la emergencia provocada por el COVID-19 y cuando la parte demandante aún administraba el CDT. Argumentó que ni de la cláusula contractual relativa a la cesión de la subvención ni de ninguna otra disposición contractual podía inferirse que la parte demandada estuviese facultada para retener aumentos o asignaciones adicionales provenientes del gobierno central. Así, concluyó que, la cuantía en controversia constituyó un aumento a la subvención tradicional cedida mediante el contrato y que el contrato no restringió la cesión del subsidio en aquellos casos en el que mismo fuese aumentado en atención a alguna emergencia, sino que cedía la totalidad de lo que se asignase, haciendo referencia a la asignación anual vigente a ese momento. Por lo que, concluyó que procedía la adjudicación del pleito por la vía sumaria.

Por su parte, el 12 de diciembre de 2025, la parte demandada presentó su *Oposición a la Petición Moción de Sentencia Sumaria de la Clínica Yágüez Inc. y Solicitud de Sentencia Sumaria a favor del Municipio de Guánica.* Coincidió en que no existían controversias materiales de hechos y que procedía adjudicar el asunto por la vía sumaria. No obstante, arguyó que en la cláusula décima del contrato establecía de manera precisa, específica y cerrada cuál sería la aportación municipal: la cesión íntegra de la subvención ordinaria recibida por parte del Departamento de Salud ascendente a $499,999.00 anuales.

Sostuvo que la cuantía de la subvención se identificó expresamente en el contrato y constituyó el monto cierto que las partes aceptaron como contraprestación económica. A su vez, expuso que el contrato únicamente contemplaba como escenario extraordinario para generar una modificación contractual la eliminación de la subvención, no su aumento. Así, rechazó la

interpretación de la parte demandante de que cualquier asignación extraordinaria posterior debía transferirse automáticamente. Indicó que la parte demandante pretendía sustituir el texto pactado en el contrato por un derecho ilimitado a todo flujo de fondos, sin distinguir entre la subvención preexistente —que sí formaba parte del contrato— y las partidas extraordinarias en virtud de una emergencia sanitaria sin precedentes. Por ello, solicitó al foro primario que denegara la solicitud de sentencia sumaria instada por la parte demandante y que, en su lugar, declarara no ha lugar a la demanda interpuesta en su contra.

El 11 de diciembre de 2025, la parte demandante instó una *Réplica a Oposición a Solicitud de Sentencia Sumaria y Oposición a Contra-Moción de Sentencia Sumaria.* En específico, señaló que la oposición a la solicitud de sentencia sumaria interpuesta por la parte demandada no cumplió con los requisitos de forma establecidos en la Regla 36.3 (b) de Procedimiento Civil, *infra.* A su vez, señaló que existían hechos propuestos que no fueron atendidos por la parte demandada en su escrito, por lo cual los mismos debían darse por admitidos. Finalmente, reiteró que la cláusula décima del contrato era clara al disponer la cesión del cien (100) por ciento de la subvención y resaltó que la inclusión de cierta cuantía en el contrato, lejos de establecer un tope de lo que la parte demandada estaba dispuesta a pagar, establecía el mínimo de lo que el operador entendía hacía que el acuerdo fuese económicamente rentable.

Luego, el 13 de enero de 2026, la parte demandada presentó una *Dúplica a Réplica a Oposición a Solicitud de Sentencia Sumaria y Oposición a Contra-Moción de Sentencia Sumaria* mediante la cual arguyó que la Regla 36 de Procedimiento Civil, *infra,* no le obligaba a seguir de forma mecánica cierta estructura sino que meramente exigía que la oposición delimitara los hechos no controvertidos y los que estaban en disputa, con referencia a los hechos planteados por

la parte promovente y a la prueba documental admisible pertinente, así como las razones de derecho para denegar el remedio. Así, concluyó que cumplió con los referidos requisitos y reiteró que el contrato establecía una suma cierta como contraprestación total por los servicios que la parte demandante prestaría en el CDT. Además, planteó que el hecho de que la Asamblea Legislativa hubiese asignado fondos de emergencia para el CDT no equivalía, por sí solo, a una obligación de indemnizar a un operador particular.

Sometido el asunto y atendidos los escritos sometidos por ambas partes, así como la prueba documental complementaria en apoyo de estos y examinada la totalidad del expediente, el 13 de marzo de 2026, el foro primario emitió una *Sentencia* mediante la cual concluyó que la parte demandante no tenía razón en sus planteamientos. Expuso que la controversia medular giraba en torno a la interpretación del expositivo décimo del contrato de administración del CDT. Señaló que, mientras la parte demandante interpretaba que dicha cláusula obligaba a ceder el cien (100) por ciento de toda subvención recibida por el Departamento de Salud para cubrir los costos operacionales del CDT, la parte demandada entendía que la cesión estaba limitada exclusivamente a la suma expresamente pactada.

El foro primario razonó que los fondos asignados a la parte demandada, mediante la Resolución Conjunta Núm. 62-2020, no constituyeron un aumento a la subvención descrita en el expositivo décimo del contrato. Asimismo, concluyó que, aun de haberse producido un aumento, la parte demandante no tenía un derecho contractual a percibirlo, ya que la cuantía pactada representaba el máximo acordado entre las partes y el contrato no contemplaba escenarios de aumentos. Así, concluyó que la parte demandante no tenía derecho a percibir contractualmente los $430,000.00

asignados a la parte demandada mediante la Resolución Conjunta Núm. 62-2020.

Por tal razón, declaró *no ha lugar* a la solicitud de sentencia sumaria presentada por la parte demanda y, en cambio, declaró *ha lugar* a la oposición [...] y solicitud de sentencia sumaria incoada por la parte demandada. En consecuencia, desestimó la *demanda* de epígrafe. Además, tras evaluar los escritos y los documentos acompañados, el foro apelado procedió a formular las siguientes determinaciones de hechos:

1. El 25 de enero de 2019, el Municipio de Guánica y la Clínica Yagüez suscribieron un "Contrato de Servicios de Administración, Operación y Uso de las Facilidades del Centro de Diagnóstico y Tratamiento de Guánica", al que se le asignó en Número de Contrato 2019-000148.

2. El contrato entre las partes expresa que, para la operación del CDT, el Municipio "ha tenido que utilizar sus fondos ordinarios y únicamente obtienen una subvención de parte del Departamento de Salud que cubre solo una fracción de los gastos que conlleva la operación", añadiendo que "[a]nualmente el costo de la operación ha aumentado, mientras que los ingresos del fisco municipal se han reducido, lo que cada vez torna más onerosa la operación del Centro de Diagnóstico y Tratamiento Juan M. Santiago".

3. En el expositivo diez (10) del Contrato de Administración del CDT se acordó que:

   Mensualmente, **EL MUNICIPIO** recibe una subvención de parte del Departamento de Salud con el propósito de cubrir parte de los costos de la operación del Centro de Diagnóstico y Tratamiento Juan M. Santiago. Dicha subvención totaliza de [sic] **CUATROCIENTO (sic) NOVENTA Y NUEVE MIL NOVECIENTOS NOVENTA Y NUEVE DOLARES ($499,999)** anualmente. Las partes han acordado que EL MUNICIPIO le cederá el cien (100) por ciento [sic] de la subvención a **LA SEGUNDA PARTE**, mientras se encuentre en vigor el presente acuerdo.

   Ante la eventualidad de que **LA SEGUNDA PARTE** administre, opere y use el Centro de Diagnóstico y Tratamiento Juan M. Santiago durante una fracción de mes, la subvención deberá pagarse a prorrata. **EL MUNICIPIO** representa y garantiza que la subvención recibida del Departamento de Salud se puede ceder a la Segunda Parte sin ningún tipo de impedimento ya sea legal o de cualquier tipo.

   En caso de que **EL MUNICIPIO** deje de recibir dicha subvención, por cualquier motivo, las partes acuerdan renegociar de buena fe los términos del contrato dentro

de un periodo de 60 días. De no llegar a un acuerdo favorable, **LA SEGUNDA PARTE** podrá, a su opción, dar por cancelado y terminado, de inmediato, este contrato, previa notificación escrita a **EL MUNICIPIO**.

4. A tenor con el expositivo veintiocho (28) del Contrato de Administración del CDT, el **MUNICIPIO**, será responsable del pago por concepto de los servicios de energía eléctrica y acueductos y alcantarillado del Centro durante la vigencia del contrato. Las contribuciones del inmueble durante la vigencia del Contrato serán pagadas por **EL MUNICIPIO** en todo momento. La **SEGUNDA PARTE** (Clínica Yagüez) será responsable de cualquier otro servicio que se requiera en la propiedad para la prestación de los servicios médicos hospitalarios que brindará a partir de la fecha en que comience este contrato y hasta su terminación.

5. A tenor con el contrato entre las partes, Clínica Yagüez se hacía responsable de todos los gastos inherentes a la operación del CDT, excepto el pago del servicio eléctrico y de agua potable, los cuales eran sufragados por el Municipio.

6. La duración del contrato suscrito entre las partes fue por el periodo del 15 de febrero de 2019 al 15 de febrero de 2023, sujeto a tres posibles extensiones por idéntico término.

7. La Clínica Yagüez operó el CDT durante la emergencia de COVID-19 entre marzo de 2020 a agosto de 2021, para un total de 16 meses.

8. El 2 de abril de 2020 y el 6 de agosto de 2020, la Asamblea Legislativa aprobó las Resoluciones Conjuntas RC-24 y RC-62, respectivamente mediante las cuales asignó fondos extraordinarios de emergencia a varios municipios, incluyendo el Municipio de Guánica, para garantizar la continuidad de los servicios de salud de los CDT's durante la pandemia del COVID-19. En virtud de la RC-62, la asamblea legislativa asignó al Municipio cuatrocientos treinta mil dólares ($430,000.00).

9. Dichos fondos eran de carácter público y restrictivo, sujetos a los términos de la legislación de emergencia y a las disposiciones del Código Municipal aplicables.

10. El Municipio recibió los $430,000.00 asignados en la RC 62, el 26 de octubre de 2020.

11. La Clínica Yagüez dejó de administrar el CDT de Guánica el 31 de agosto de 2021.

12. El Contrato Núm. 2021-DS0202 para subvencionar los servicios de Sala de emergencia del CDT Municipal establece una asignación anual de cuatrocientos noventa y nueve mil dólares ($499,999.00). Esa cantidad equivale a una subvención mensual de cuarenta y un mil quinientos ochenta y tres dólares con treinta centavos (41,583.33). Este contrato tenía una vigencia a partir del 30 de junio de 2020 a 30 de junio de 2021.

13. La Enmienda al Contrato Núm. 2021-DS0202A para subvencionar los servicios de Sala de emergencia del CDT Municipal establece una asignación mensual de cuarenta y un mil quinientos ochenta y tres dólares con treinta centavos (41,583.33). Este contrato tenía una vigencia a partir del 1 de julio de 2021 a 31 de julio de 2021.

14. La Enmienda al Contrato Núm. 2021-DS0202B para subvencionar los servicios de Sala de emergencia del CDT Municipal establece una asignación anual de cuatrocientos cincuenta y siete mil cuatrocientos diez y seis dólares con sesenta y siete centavos ($457,416.67). Pagará la cantidad trimestral de $124,750.00 hasta un máximo de $457,416.67 anual, los pagos se efectuarán por trimestres vencidos previa presentación de la factura mensual acompañada de los informes requeridos. Este contrato tenía una vigencia a partir del 1 de agosto de 2021 a 30 de junio de 2022.

15. El Contrato Núm. 2023-DS0998 para subvencionar los servicios de Sala de emergencia del CDT Municipal establece una asignación anual de cuatrocientos noventa y nueve mil dólares ($499,999.00). Esa cantidad equivale a una subvención mensual de cuarenta y un mil quinientos ochenta y tres dólares con treinta centavos (41,583.33). Este contrato tenía una vigencia a partir del 1 de julio de 2022 a 30 de junio de 2023.

16. La Enmienda al Contrato Núm. 2023-DS0998A como subvención al servicio de Sala de Emergencias las 24 horas del día del CDT Municipal establece una cuantía adicional de $350,000.00 ($50,000.00) mensual a partir del 1 de diciembre de 2022 hasta 31 de julio de 2023. Los pagos se efectuarán en mensualidades de $50,000 correspondientes a la subvención solicitada y aprobada por el Dpto. de Salud para la operación del turno adicional.

17. Las anteriores subvenciones serían distribuidas según el periodo contractual con las compañías administradoras del CDT [...]

18. Para que el Municipio pueda obtener los fondos asignados por parte del Departamento de Salud, el Municipio de Guánica debe presentar una factura mensual, un informe mensual de gastos y cualquier otra documentación complementaria que el Dpto. de Salud requiera para fines de evaluación, verificación o auditoría, según lo establecido en el contrato vigente.

19. Según la Clínica Yagüez, su ingreso por razón de servicios a pacientes para los 10 meses y medio de 2019 en que el demandante operó el CD fue de $1,621,643.00; lo que se redujo a $877,780.00 para el año completo de 2020; y a $631,104.00 durante los primeros 8 meses de 2021.

20. Según la Clínica Yagüez, la pérdida generada por la operación del CDT durante la crisis del COVID-19 excede los $430,000.00 asignados por la Asamblea Legislativa.

21. Según la Clínica Yagüez, la cantidad de pacientes atendidos en la sala de emergencias durante los 10 meses y medio de 2019 en que el demandante operó el CDT fue 19,544; lo que se redujo a 9,270 para el año completo de 2020; y a 7,496 durante los primeros 8 meses de 2021.

22. El balance de las operaciones de la Clínica Yagüez en el CDT de Guánica fue durante los 10 meses y medio de 2019 fue de una pérdida de $235,637.00; otra pérdida de $377,396.00 para el año completo de 2020; y finalmente una pérdida de $407,696.00 durante los primeros 8 meses de 2021.

23. Según la Clínica Yagüez, no obstante, que durante la crisis del COVID-19, la parte demandante se vio precisada a eliminar uno de los turnos de enfermería, sus gastos se mantuvieron constantes, pero se vieron adversamente afectados por un ingreso sustancialmente reducido por la disminución en pacientes.

24. La Sra. Grety L. Martinez Santiago, Directora del Dpto. de finanzas del Municipio, declaró en la deposición que encontró que los $430,000, se le pagaron a New Medical Quality Services.

25. La Sra. Grety L. Martinez Santiago, Directora del Dpto. de finanzas del Municipio, declaró que de los fondos asignados por la RC-62, se utilizaron para el Centro de Servicios de Salud y pudo traer evidencia de $425,000 porque quien creó el proyecto en aquel momento creó $425,000 en una partida, $5,000 en otra partida.

26. La compañía New Medical Services operó el CDT entre octubre a noviembre de 2021 hasta diciembre de 2023, aproximadamente un año después de recibido el desembolso de los $430,000.00.

27. La Sra. Martínez declaró en la deposición no saber si el demandante reclamó tener derecho a los fondos asignados por la RC-62.

28. La Sra. Martínez contestó en la deposición estar de acuerdo con la pregunta de si alguien había incurrido en gastos no presupuestados para la administración del CDT a agosto de 2020, ese fue Clínica Yagüez y no New Medical.

29. El 6 de junio de 2022 el Municipio de Guánica, a través de su representante legal, remitió una carta a CYI en la que negó el reclamo de la Clínica Yagüez de los fondos asignados mediante las resoluciones conjuntas porque estos no estaban destinados al operador privado en carácter de arrendatario, de las facilidades del Centro de Salud, según una consulta con el Secretario Auxiliar del Departamento de Salud.

30. La Clínica Yagüez, a través de su representante, el Sr. Carlos I. Huertas Burgos, señaló que el gobierno municipal no adeuda suma alguna por servicios prestados objeto del contrato.

31. La reclamación de la Clínica Yagüez corresponde a los fondos asignados mediante la Resolución Conjunta.31 24. La Clínica Yagüez no envió al Municipio de Guánica factura alguna por gastos adicionales.

32. No existe deuda alguna en relación con los términos del contrato o factura pendiente de pago.33 26. La Clínica Yagüez, Inc. subarrendó facilidades del Municipio de Guánica sin autorización de éste conservando para sí el producto de dicho subarrendamiento.

33. El Contrato suscrito entre las partes no posee una cláusula en la que el Municipio impidiera el subarriendo del inmueble.

34. Como parte del contrato, la Clínica Yagüez, Inc. se obligó a invertir la suma de trescientos mil dólares ($300,000.00) en mejoras a las facilidades del CDT, no obstante, ello no ocurrió por lo que se acordó concederle una reducción en la renta mensual equivalente a más del cincuenta por ciento (50%) de la renta original, es decir, que la parte demandante dejó de pagar seis mil seiscientos noventa y ocho dólares ($6,698.00) menos al mes de lo acordado originalmente.

Inconforme, el 13 de abril de 2024, la parte apelante compareció ante *nos* mediante *apelación* alegando la comisión de los siguientes errores:

Erró el TPI al no interpretar las resoluciones conjuntas emitidas como un aumento en la subvención anual a la operación del CDT.

Erró el TPI al resolver que la Ley 237-2004 aplica al contrato entre las partes de marras o que la misma hubiese sido vulnerada si se hubiesen desembolsado los fondos asignados por la Asamblea Legislativa.

Examinado el recurso ante nuestra consideración, el 16 de abril de 2026, emitimos una *Resolución* mediante la cual le concedimos un término de veinte (20) días a la parte apelada para presentar su posición al recurso de apelación. En cumplimiento, el 5 de mayo de 2026, la parte apelada compareció ante este foro intermedio mediante *Alegato en Oposición del Municipio de Guánica.*

Contando con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A. Sentencia sumaria**

Como es sabido, la Regla 36 de Procedimiento Civil (32 LPRA Ap. V) regula todo lo relacionado a la moción de sentencia sumaria. *Cruz, López v. Casa Bella y otros*, 213 DPR 980, 993 (2024); *Acevedo y otros v. Depto. Hacienda y otros*, 212 DPR 335, 349 (2023). Dicho mecanismo procesal es utilizado en aquellos litigios que no presentan controversias genuinas de hechos materiales y que, por consiguiente, la celebración de un juicio en su fondo no es necesaria en la medida que solo resta por dirimir determinadas controversias de derecho. *Acevedo y otros v. Depto. Hacienda y otros*, *supra*, pág. 350; *SLG Fernández-Bernal v. RAD-MAN et al.*, 208 DPR 310, 334 (2021). Según ha resuelto nuestro Tribunal Supremo, un hecho material es aquel que puede alterar la forma en que se resuelve una reclamación, de acuerdo con el derecho sustantivo aplicable. *Cruz, López v. Casa Bella y otros, supra*, pág. 993.

El propósito que persigue el mecanismo de la sentencia sumaria es que los pleitos civiles sean solucionados de forma justa, rápida y económica. *González Meléndez v. Mun. San Juan et al.*, 212 DPR 601, 610 (2023). Véase, además, *Acevedo y otros v. Depto. Hacienda y otros, supra,* pág. 350; *SLG Fernández-Bernal v. RAD-MAN et al., supra*, pág. 335; *Rodríguez Méndez et al. v. Laser Eye*, 195 DPR 769, 785 (2016). Por tanto, quien promueva la sentencia sumaria deberá establecer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material. *Oriental Bank v. Caballero García*, 212 DPR 671, 679 (2023). Así, la Regla 36.3 de Procedimiento Civil (32 LPRA Ap. V), establece cual será el contenido y los requisitos de forma que deberán observarse tanto en la solicitud de sentencia sumaria que inste la parte promovente, como en la oposición que pueda presentar la parte promovida. *Acevedo y otros v. Depto. Hacienda y otros,*

*supra*, pág. 350; *León Torres v. Rivera Lebrón*, 204 DPR 20, 43 (2020).

Por ser la sentencia sumaria un remedio discrecional, el principio rector para el uso de este mecanismo es el sabio discernimiento del juzgador, ya que mal utilizada puede privar a una parte de su día en corte, principio elemental del debido proceso de ley. *Jusino et als. v. Walgreens*, 155 DPR 560, 578 (2001). Así pues, un tribunal podrá emitir una sentencia sumaria si de las alegaciones, deposiciones, contestaciones, interrogatorios y admisiones ofrecidas, junto a las declaraciones juradas – según fueran ofrecidas – surge que no existe una controversia real sustancial en cuanto a ningún hecho material, restando entonces resolver la controversia en estricto derecho. *Acevedo y otros v. Depto. Hacienda y otros*, *supra*, pág. 351. Véase, además, Regla 36.3 de Procedimiento Civil, *supra*. Así pues, resulta esencial que de la prueba que acompaña la solicitud de sentencia sumaria surja de manera preponderante que no existe controversia sobre los hechos medulares del caso. *Cruz, López v. Casa Bella y otros*, *supra*, pág. 993.

Así, para sostener u oponerse a una petición de sentencia sumaria las partes podrán presentar, entre otras, las siguientes piezas de evidencia: certificaciones, documentos públicos, admisiones de la parte contraria, deposiciones, contestaciones a interrogatorios, declaraciones juradas o affidavits, y hasta prueba oral. *Acevedo y otros v. Depto. Hacienda y otros*, *supra*, pág. 350 citando a R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil*, 6ta ed., San Juan, LexisNexis, 2017, pág. 318. Nuestro máximo Foro ha sido enfático en que, cuando una parte acompaña su solicitud u oposición de sentencia sumaria de una o varias declaraciones juradas, estas deben cumplir con las disposiciones especiales pautadas en la Regla 36.5 de Procedimiento

Civil (32 LPRA Ap. V). *Acevedo y otros v. Depto. Hacienda y otros, supra,* pág. 350.

A esos efectos, se requiere que las declaraciones juradas demuestren afirmativamente el conocimiento personal y la calificación del testigo, también se requiere que se presenten únicamente hechos admisibles como evidencia en un juicio. Hernández Colón, *op. cit.* pág. 319. Por consiguiente, cuando la solicitud de sentencia sumaria está apoyada en una o varias declaraciones juradas, dicha prueba no podrá contener solo conclusiones sin hechos específicos que las sustenten. *Acevedo y otros v. Depto. Hacienda y otros, supra,* págs. 350-351; *Roldán Flores v. M. Cuebas et al.,* 199 DPR 644, 677 (2018). Lo anterior, serían meras conclusiones reiterando las alegaciones de la demanda y, por tanto, prueba insuficiente y sin valor probatorio. *Acevedo y otros v. Depto. Hacienda y otros, supra,* pág. 351 citando a J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil,* San Juan, Pubs. J.T.S., 2000, T. I, págs. 615-616.

El Tribunal Supremo de Puerto Rico ha sido enfático en que, el hecho de que la parte promovida no presente prueba que controvierta la evidencia presentada por la parte promovente de la moción de sentencia sumaria, no implica que dicha moción procederá automáticamente si efectivamente existe una controversia sustancial sobre hechos materiales. *Acevedo y otros v. Depto. Hacienda y otros, supra,* pág. 351; *SLG Fernández-Bernal v. RAD-MAN et al., supra,* pág. 337. Ahora bien, nuestro máximo Foro ha reiterado que una moción de sentencia sumaria no procederá cuando: (1) existen hechos materiales controvertidos (2) hay alegaciones afirmativas en la demanda que no han sido refutadas (3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material, o (4) como cuestión de derecho no procede. *Acevedo y otros v. Depto. Hacienda*

*y otros, supra,* pág. 351. Véase, además, *SLG Fernández-Bernal v. RAD-MAN et al., supra,* págs. 335-336; *Vera v. Dr. Bravo,* 161 DPR 308, 333-334 (2004).

De igual forma, el mecanismo de sentencia sumaria no es utilizable cuando existen controversias de hechos materiales sobre elementos subjetivos de intención, propósitos mentales o negligencia. *Cruz, López v. Casa Bella y otros, supra,* pág. 993. Véase, además, *Acevedo y otros v. Depto. Hacienda y otros, supra,* pág. 352; *Velázquez Ortiz v. Mun. de Humacao,* 197 DPR 656, 663 (2017); *Ramos Pérez v. Univisión,* 178 DPR 200, 219 (2010); *Soto v. Hotel Caribe Hilton,* 137 DPR 294, 301 (1994). Sin embargo, nada impide que se utilice el mecanismo de sentencia sumaria en reclamaciones que requieran elementos subjetivos o de intención cuando de los documentos a ser considerados en la solicitud de sentencia sumaria surge la inexistencia de controversia en torno a los hechos materiales. *Cruz Cruz y otros v. Casa Bella Corp., supra,* págs. 993-994.

Ahora bien, una vez presentada una moción de sentencia sumaria y se sostenga en la forma provista en la Regla 36, la parte contraria no podrá descansar solamente en las aseveraciones o negaciones contenidas en sus alegaciones, sino que estará obligada a contestar en forma tan detallada y específica como lo haya hecho la parte promovente. De no hacerlo así, se dictará la sentencia sumaria en su contra si procede. Véase, Regla 36.3 (c) de Procedimiento Civil, *supra.*

Además, puntualizamos que "al momento de atender una solicitud de revisión de sentencia sumaria los foros apelativos estamos llamados a examinar el expediente de *novo* y verificar que las partes cumplieron con las exigencias pautadas en las Reglas de Procedimiento Civil". *Acevedo y otros v. Depto. Hacienda y otros, supra,* pág. 352. Véase, además, *SLG Fernández-Bernal v. RAD-MAN*

*et al., supra,* pág. 338; *Rivera Matos et al. v. Triple-S et al.,* 204 DPR 1010 (2020); *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 118 (2015). Según ha establecido el Tribunal Supremo, este Tribunal está limitado a: (1) considerar los documentos y argumentos que se presentaron ante el foro primario (lo cual implica que, en apelación, los litigantes no pueden añadir prueba que no fue presentada oportunamente ante el tribunal de instancia ni esbozar nuevas teorías); (2) determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y (3) determinar si el derecho se aplicó de forma correcta. *González Meléndez v. Mun. San Juan et al., supra,* pág. 611. Así pues, los foros apelativos estamos en la misma posición que los tribunales de instancia y se utilizan los mismos criterios para evaluar una solicitud de sentencia sumaria. *Íd.* Véase, además, *Cruz, López v. Casa Bella y otros, supra,* pág. 994.

**B. Sentencia declaratoria**

La Regla 59 de Procedimiento Civil, 32 LPRA Ap. V, R.59, establece que una sentencia declaratoria "es un mecanismo remedial y profiláctico que permite anticipar la dilucidación de los méritos de cualquier reclamación ante los tribunales, siempre y cuando exista un peligro potencial contra quien la solicita". *Alcalde de Guayama v. ELA,* 192 DPR 329, 333 (2015), citando a *Sánchez et al. v. Srio. de Justicia et al.,* 157 DPR 360, 383-384 (2002). La precitada regla expone que "[e]l Tribunal de Primera Instancia tendrá autoridad para declarar derechos, estados y otras relaciones jurídicas, aunque se inste o pueda instarse otro remedio". 32 LPRA Ap. V, R. 59.1. Añade la regla que "[n]o se estimará como motivo suficiente para atacar un procedimiento o una acción el que se solicite una resolución o sentencia declaratoria. La declaración podrá ser en su forma y efectos, afirmativa o negativa, y tendrá la eficacia y el vigor de las sentencias o resoluciones definitivas." *Íd.*

No obstante, "el Tribunal podrá negarse a dar o a registrar una sentencia o decreto declaratorio cuando tal sentencia o decreto, de ser hecho o registrado, no haya de poner fin a la incertidumbre o controversia que originó el procedimiento." 32 LPRA Ap. V, R. 59.3.

La Regla 59.2 inciso (c) aclara que "[l]a enumeración hecha en los incisos (a) y (b) de esta regla, no limita ni restringe el ejercicio de las facultades generales conferidas en la Regla 59.1 dentro de cualquier procedimiento en que se solicite un remedio declaratorio, siempre que una sentencia o decreto haya de poner fin a la controversia o despejar una incertidumbre." 32 LPRA Ap. V, R. 59.2. El Tribunal Supremo hizo eco a este inciso cuando declaró que la sentencia declaratoria es "aquella que se dicta cuando existe una controversia sustancial entre partes con intereses legales adversos, con el propósito de disipar la incertidumbre jurídica". *Mun. Fajardo v. Srio. Justicia et al.*, 187 DPR 245, 254 (2012), citando a R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil*, 5ta ed., San Juan, Ed. LexisNexis, 2010, Sec. 6001, pág. 560).

## C. Contratación gubernamental

Nuestro sistema de derecho permite la libertad de contratación; siempre y cuando, los pactos, cláusulas y condiciones no sean contrarios a la ley, la moral o al orden público. Art. 1207 del Código Civil de Puerto Rico de 1930[2], 31 LPRA ant. sec. 3556. Si se cumple con lo dispuesto, el contrato tendrá fuerza de ley entre las partes, por lo que ambas se obligan al cumplimiento de lo allí pactado y de sus consecuencias. Arts. 1044 y 1210 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 2995 y 3375, respectivamente. En adición, "cuando los términos de un contrato son claros y no crean ambigüedades, estos se aplicarán en atención

---

[2] El Código Civil de Puerto Rico de 1930 fue derogado el 28 de noviembre de 2020. No obstante, era el estado de derecho vigente a la fecha de la controversia de autos, por lo que es el código aplicable.

al sentido literal que tengan". *CFSE v. Unión de Médicos*, 170 DPR 443, 450 (2007).

Ahora bien, cuando el contrato se otorga con una entidad gubernamental, los principios generales de contratación privada no agotan el análisis. Como es conocido, "la contratación gubernamental está revestida del más alto interés público, pues persigue promover la inversión adecuada, responsable y eficiente de los recursos del Estado". *Redmane Technology, LLC v. Departamento de Salud y D2SOL, Inc.,* 217 DPR ___ (2026), 2026 TSPR 37 (resuelto el 10 de abril de 2026). Véase, además, *Mun. Aguada v. W Const. y Recovery Finance,* 214 DPR 432, 452 (2024*)*; *St. James Sec. v. AEE,* 213 DPR 366, 377 (2023); *Demeter Int'l v. Srio. Hacienda,* 199 DPR 706, 729 (2018); *CFSE v. Unión de Médicos*, 170 DPR 443, 452 (2007). Así, las normas que rigen los contratos deben aplicarse rigurosamente, pues persiguen el fin de salvaguardar los intereses y el patrimonio del pueblo. *Mun. Aguada v. W Const. y Recovery Finance, supra*, pág. 453; *SLG Ortiz-Mateo v. ELA*, 211 DPR 772, 794 (2023); *Demeter Int'l v. Srio. Hacienda, supra*, pág. 729. Dicha rigurosidad responde al interés del Estado en promover una sana y recta administración pública, mediante la prevención del despilfarro, la corrupción y el amiguismo en la contratación gubernamental. *CMI Hospital v. Depto. Salud*, 171 DPR 313, 320 (2007).

En consonancia, no puede pasarse por alto que todo organismo gubernamental está obligado a cumplir cabalmente con las disposiciones constitucionales, pues los fondos públicos solo pueden destinarse a fines públicos legítimos. *SLG Ortiz-Mateo v. ELA, supra*, pág. 794; *Demeter Int'l v. Srio. Hacienda, supra*, pág. 729; *CFSE v. Unión de Médicos, supra*, pág. 452. En consecuencia, el gobierno "no puede actuar de un modo que esté reñido con los principios que encarna el orden constitucional". *Demeter Int'l v. Srio.*

*Hacienda, supra*, pág. 729, citando a *De Jesús González v. AC*, 148 DPR 255, 268 (1999).

Así pues, el Tribunal Supremo ha determinado que todo contrato gubernamental debe cumplir con los siguientes requisitos: (1) constar por escrito; (2) mantener un registro que establezca su existencia; (3) remitir una copia a la Oficina del Contralor de Puerto Rico, y (4) acreditar que se realizó y otorgó quince días antes. *Mun. Aguada v. W Const. y Recovery Finance, supra*, pág. 453; *SLG Ortiz-Mateo v. ELA, supra*, pág. 794; *Génesis Security v. Depto. Trabajo*, 204 DPR 986, 998 (2020); *ALCO Corp. v. Mun. de Toa Alta*, 183 DPR 530, 537 (2011); *Ocasio v. Alcalde Mun. de Maunabo*, 121 DPR 37, 54 (1988). Dada su importancia, se ha señalado que estos requisitos "sirven como mecanismo de cotejo para perpetuar circunstancial y cronológicamente esos contratos y, así, evitar pagos y reclamaciones fraudulentas". *SLG Ortiz-Mateo v. ELA, supra*, pág. 795; *Génesis Security v. Depto. Trabajo, supra*, pág. 998. Véase, además, *Vicar Builders v. ELA et al.*, 192 DPR 256, 264 (2015); *ALCO Corp. v. Mun. de Toa Alta*, supra, págs. 537-538.

Nuestro Máximo Foro ha reiterado en múltiples ocasiones que quienes contratan con cualquier entidad gubernamental sin cumplir con los requisitos de contratación gubernamental, se exponen a asumir el riesgo de sus propias pérdidas. *SLG Ortiz-Mateo v. ELA, supra*, pág. 796; *Rodríguez Ramos et al. v. ELA et al.*, 190 DPR 448, 461 (2014); *Quest Diagnostic v. Mun. San Juan*, 175 DPR 994, 1002 (2009). Por tal razón, "para evitar situaciones irregulares en las que el Estado termine lucrándose injustificadamente, las partes deberán ser meticulosas al otorgar sus contratos". *Vicar Builders v. ELA et al., supra*, pág. 269.

**D. Resolución Conjunta Núm. 24 de 2 abril de 2020 y Resolución Conjunta Núm. 62 de 6 de agosto de 2020**

La Resolución Conjunta Núm. 24 de 2 abril de 2020 (Resolución Conjunta 24-2020) fue aprobada por la Asamblea Legislativa de Puerto Rico como una medida de emergencia dirigida a atender las circunstancias extraordinarias ocasionadas por la pandemia del COVID-19. Por virtud de la Resolución Conjunta Núm. 24-2020 se ordenó al Departamento de Salud transferir la cantidad de siete millones quinientos cincuenta mil dólares ($7,550,000.00) a los municipios para la operación y los gastos de funcionamientos de las Salas de Emergencias de Centros de Diagnóstico y Tratamiento (CDT).

Según la exposición de motivos de la Resolución Conjunta Núm. 24-2020, el Gobierno de Puerto Rico subsidiaba parte de las operaciones de veintiocho (28) CDT que eran operados por los municipios, mediante asignación presupuestaria al Departamento de Salud. A su vez, la Resolución Conjunta Núm. 24-2020 reconoció que, a pesar de que los servicios médicos de emergencia permanecían abiertos ofreciendo servicios ininterrumpidos a la ciudadanía, estos enfrentaron un descenso dramático en las visitas de pacientes debido al miedo que experimentaba la ciudadanía a un posible contagio con COVID-19, lo cual representaba una disminución de ingresos que convertía la operación de este tipo de facilidades en una insostenible. Asimismo, expuso que la merma en pacientes provocó un aumento exponencial en los gastos para la compra de medicamentos, materiales médico-quirúrgicos y equipos de protección personal, tanto para sus empleados como para los mismos pacientes. Por tal razón, la Asamblea Legislativa entendió necesario proveer recursos adicionales a los CDT para reducir el impacto que la merma de visitas tiene en sus operaciones.

Respecto a cómo serían distribuidos dichos fondos, la Sección 2 de la Resolución Conjunta Núm. 24-2020, dispuso lo siguiente:

Los fondos objeto de esta Resolución Conjunta serán transferidos por el Departamento de Salud a los municipios para la operación y gastos de funcionamientos de las Salas de Emergencias de Centros de Diagnóstico y Tratamiento, en la misma proporción que se distribuyeron los fondos consignados en la Resolución Conjunta que asigna del Fondo General del Tesoro Estatal los fondos para los gastos del Gobierno de Puerto Rico para el año fiscal que concluye el 30 de junio de 2020. Dichos fondos solo podrán ser utilizados con el único propósito de garantizar las operaciones ininterrumpidas durante el paso de esta emergencia. **El Departamento de Salud realizará la transferencia de fondos de manera inmediata a los municipios que operan los veintiocho (28) Centros de Diagnóstico y Tratamiento**.

(Énfasis nuestro).

Más adelante, la Asamblea Legislativa aprobó la Resolución Conjunta Núm. 62 de 6 de agosto de 2020 para enmendar las Secciones 1 y 2 de la Resolución Conjunta 24-2020, *supra*, a los fines de aclarar cómo se realizaría la distribución de fondos a los municipios para la operación y los gastos de funcionamientos de las Salas de Emergencias de los CDT. De la exposición de motivos de la referida resolución conjunta surge lo siguiente:

El Departamento de Salud entiende que aquellos municipios que han incurrido en gastos no presupuestados para la operación de sus facilidades médicas y hayan sufrido pérdidas económicas por la disminución marcada de las visitas a estas facilidades, deben recibir una aportación equitativa de los fondos consignados en la Resolución Conjunta que asigna del Fondo General del Tesoro Estatal. En ese sentido, es meritorio señalar que la intención de esta Resolución Conjunta es ayudar a los municipios que ostentan una carga económica con la operación de estas facilidades, a que se mantengan ofreciendo los cuidados médicos de manera ininterrumpida en beneficio de la población. **A pesar de que son muchos los municipios que tienen Centros de Diagnóstico y Tratamiento, no todos tienen la responsabilidad económica de la operación y administración de éstos. Por tal razón, esta enmienda busca aclarar la distribución de este fondo para estos municipios.** Es importante señalar que estos Centros de Diagnóstico y Tratamiento, a pesar de pertenecer a un municipio particular, ofrecen servicio a cualquier paciente sin importar el municipio en el que residan.

(Énfasis nuestro).

Por otra parte, la Sección 2 de la Resolución Conjunta Núm. 24-2020 fue enmendada para que leyera de la siguiente forma:

> "Los fondos a ser transferidos a los municipios según la Sección 1 de esta Resolución Conjunta, serán distribuidos a los municipios de Naguabo, Guayanilla, Las Piedras, Luquillo, **Guánica**, Humacao, Canóvanas, Santa Isabel, Maunabo, Juncos, Cayey, Cataño, Sabana Grande, Manatí, Guaynabo, San Juan, Bayamón, Yabucoa, y Jayuya para la operación y gastos de funcionamientos de las Salas de Emergencias de Centros de Diagnóstico y Tratamiento. Los fondos se distribuirán a razón de ciento cincuenta mil dólares ($150,000) para cada uno de los siguientes municipios: Bayamón, Guaynabo, Humacao y San Juan; y cuatrocientos treinta mil dólares ($430,000) para cada uno de los restantes municipios enumerados en esta Sección. **Dichos fondos solo podrán ser utilizados con el único propósito de garantizar las operaciones ininterrumpidas durante el paso de esta emergencia**. La Oficina de Gerencia y Presupuesto realizará la transferencia de fondos ordenada en esta Resolución Conjunta de manera inmediata."

(Énfasis nuestro).

### III.

Por estar estrechamente relacionados los errores señalados en el recurso de apelación bajo nuestra consideración, procederemos a discutirlos en conjunto. En síntesis, la parte apelante sostiene que erró el foro primario al no interpretar las resoluciones conjuntas emitidas como un aumento en la subvención anual a la operación del CDT. Asimismo, asevera que incidió el foro apelado al resolver que la Ley Núm. 237-2004 aplica al contrato entre las partes de marras o que la misma hubiese sido vulneradas si se hubiesen desembolsado los fondos asignados por la Asamblea Legislativa.

Nos corresponde determinar inicialmente, y de conformidad con lo resuelto por nuestro Tribunal Supremo en el caso de *Roldán Flores v. M. Cuebas et al., supra,* si las partes cumplieron con los requisitos que dimanan de la Regla 36 de Procedimiento Civil, *supra,* de modo que podamos entonces considerar las mociones presentadas. *Veamos.*

Al examinar la *Solicitud de Sentencia Sumaria* presentada por la parte apelante ante el foro primario sopesamos que esta cumplió con los requisitos recabados por la Regla 36.3 (a) de Procedimiento Civil, *supra.* En particular, la solicitud de la parte apelante contiene una exposición breve de las alegaciones de las partes, los asuntos litigiosos en controversia, el petitorio sumario solicitado, así como las razones por las cuales debía ser dictada la sentencia a su favor, argumentando el derecho aplicable. A su vez, incluyó una relación concisa, organizada y en párrafos enumerados de los hechos esenciales y pertinentes sobre los cuales, a su juicio, no existía controversia sustancial, haciendo referencia a los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia en que se sustentaban dichos hechos.

Por otro lado, al examinar el escrito en *Oposición a la Petición Moción de Sentencia Sumaria de la Clínica Yagüez Inc. y Solicitud de Sentencia Sumaria a Favor del Municipio de Guánica* presentado por la parte apelada, advertimos que éste incumple sustancialmente con los requisitos de forma establecidos por la Regla 36.3 (b) de Procedimiento Civil, *supra.* En su escrito, la parte apelada en lugar de discutir cada uno de los veintitrés (23) párrafos enumerados contenidos en el petitorio sumario de la parte apelante, tal y como lo exige la Regla 36.3(b)(3) de Procedimiento Civil, *supra*, incluyó una sección con diez (10) párrafos titulada "Exposición de Hechos Relevantes que no están en Controversia"; otra sección con tres (3) párrafos titulada "Hechos Incontrovertidos Omitidos por la Parte Demandante" y; una tercera sección titulada "Hechos en Controversia", en la cual sí hace referencia a algunos de los hechos incontrovertidos contenidos en el escrito de la parte apelante. Sin embargo, sobre dichos hechos se limitó a expresar que estaban en controversia sin controvertirlos de manera específica, ni acompañarlos de prueba admisible o declaraciones juradas que

sustentaran su posición. En consecuencia, no sustentó adecuadamente sus alegaciones para que fueran consideradas por el foro primario ni por este Tribunal.

Sin embargo, el solo hecho de no presentar evidencia que controvierta la de la parte promovente no implica automáticamente que procederá la sentencia sumaria. *Fernández Martínez v. RAD-MAN San Juan, supra,* pág. 337. Por consiguiente, debemos evaluar si existe una controversia legítima sobre algún hecho material que impida disponer del caso por la vía sumaria. Tras un examen detenido del expediente, de las mociones de sentencia sumaria y sus respectivas oposiciones, así como de los documentos anejados a estas, concluimos que no existen hechos materiales en controversia. En consecuencia, coincidimos con las determinaciones de hechos formuladas por el foro primario y las adoptamos como nuestras.

Ahora bien, según discutido, debemos recordar que, para que proceda una moción de sentencia sumaria, no basta con la inexistencia de hechos en controversia, sino que la *sentencia* debe proceder conforme al derecho sustantivo. *Ortiz v. Holsum,* 190 DPR 511, 525 (2014). Por tal razón, nos corresponde revisar *de novo* si el foro primario aplicó correctamente el derecho.

De entrada, coincidimos con el foro primario en que el contrato suscrito entre las partes es claro y específico en cuanto al alcance de la obligación asumida por la parte apelada. La cláusula contractual pertinente establece que la parte apelada recibía una subvención del Departamento de Salud "con el propósito de cubrir parte de los costos de operación del Centro de Diagnóstico y Tratamiento", precisando además que "[d]icha subvención totaliza [...] $499,999 anualmente". Acto seguido, las partes acordaron que la parte apelada "cederá el cien (100) por ciento de la subvención" a la parte apelante mientras estuviese vigente el contrato.

De una lectura sosegada e integral de dicha disposición no surge que las partes hayan pactado la cesión de cualquier asignación futura, extraordinaria o suplementaria relacionada con el CDT. Por el contrario, la cláusula identifica de manera específica la subvención objeto de cesión, su procedencia y su cuantía anual. Más aún, el propio contrato contempló expresamente el escenario en que la parte apelada dejara de recibir dicha subvención, disponiendo entonces un mecanismo de renegociación entre las partes. Sin embargo, nada se incluyó respecto a la posibilidad de un aumento en los fondos asignados o la eventual recepción de partidas extraordinarias. Así pues, no existe margen para concluir que las partes acordaron que toda asignación adicional quedaría automáticamente comprendida dentro de la cesión pactada. Interpretar el contrato de esa manera equivaldría a imponer obligaciones económicas adicionales que no fueron expresamente asumidas y pactadas por las partes en el contrato suscrito.

De otra parte, el lenguaje de las resoluciones conjuntas tampoco sostiene la interpretación propuesta por la parte apelante. Tanto la Resolución Conjunta Núm. 24-2020 y la Resolución Conjunta Núm. 62-2020 dispusieron asignaciones dirigidas a los municipios para atender los efectos de la emergencia ocasionados por la pandemia del COVID-19 y contribuir a la operación de los CDT y sus salas de emergencia. No obstante, dichas medidas legislativas no distinguieron entre municipios que administraban directamente dichas facilidades y aquellos que, como en el presente caso, habían delegado su operación mediante contratos con entidades privadas.[3] Tampoco dispusieron que los fondos asignados debían ser transferidos a terceros operadores privados ni

---

[3] En lo pertinente, la Resolución Conjunta Núm. 62-2020 dispone lo siguiente: "A pesar de que son muchos los municipios que tienen Centros de Diagnóstico y Tratamiento, no todos tienen la responsabilidad económica de la operación y administración de éstos. Por tal razón, esta enmienda busca aclarar la distribución de este fondo para estos municipios". Véase, Exposición de Motivos.

modificaron obligaciones contractuales previamente pactadas. Por el contrario, la Asamblea Legislativa se limitó a expresar que los fondos serían designados directamente a los municipios para atender la situación de emergencia.

En cuanto al señalamiento de error relacionado con la aplicación de la Ley Núm. 237-2004, coincidimos parcialmente con la parte apelante en que dicha ley no resulta de aplicación directa al contrato de autos, por tratarse esta de una legislación relativa a contratos de servicios profesionales y consultivos. Sin embargo, ello no altera el resultado del presente caso. Independientemente de la aplicabilidad específica de dicha ley, el contrato objeto de controversia continúa sujeto a los principios generales que rigen la contratación gubernamental, particularmente a aquellos relacionados con la necesidad de que las obligaciones del Estado consten claramente por escrito. Recordemos que cuando la contratación involucra el uso de bienes o fondos públicos, corresponde una aplicación rigurosa de todas las normas pertinentes a la contratación y desembolso de esos fondos, a los fines de proteger los intereses y dinero del pueblo. *De Jesús González v. AC, supra,* págs. 267-268.

En consecuencia, tras examinar detenidamente las resoluciones conjuntas en controversia, el contrato suscrito entre las partes y los escritos sometidos por estas, concluimos que el foro primario no erró al determinar que los fondos asignados mediante la Resolución Conjunta Núm. 24-2020 y la Resolución Conjunta Núm. 62-2020 no constituyeron un aumento automático a la subvención anual cedida contractualmente a la parte apelante, sino a una asignación de fondos de carácter extraordinaria para proveer recursos por motivos de la pandemia del COVID-19. Por tal razón, colegimos que la cuantía de $430,000.00 reclamada por la parte apelante no formaba parte de la obligación contractual suscrita por

las partes y, en consecuencia, procede confirmar la sentencia apelada.

**IV.**

Por los fundamentos antes expuestos, *confirmamos* la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones